THE WARDENS OF THE CHURCH OF ST. LOUIS OF NEW ORLEANS *v.* ANTOINE BLANC, Bishop of New Orleans.

A vacancy in the office of Curate of the Church of St. Louis of New Orleans, cannot deprive the corporation of the faculty of suing. The Curate is an *ex officio* member of the board of Wardens, having but one vote, like any other member, in its deliberations. Stat. 7 March, 1816. 22 March, 1822.

The statutes of 7 March, 1816, and 22 March, 1822, incorporating "The Wardens of the Church of St. Louis of New Orleans," do not give the wardens a right to appoint, in the theological sense of the word, a curate, but only to provide for his salary; but they have a perfect right to withhold all salary from any person whatever, and even to prevent one claiming to be curate from entering the church belonging to the corporation. *Per Curiam:* The legislature have not, and could not, authorize the wardens to interfere in matters of mere church discipline and doctrine, nor constitutionally declare what shall constitute a curate in the Catholic acceptation of the word, without interfering in matters of religious faith and worship, and taking a first step towards a church establishment by law.

A bishop cannot be made liable in damages for any expression of opinion as to the extent of his episcopal authority, nor for any act or omission in the exercise of his spiritual functions. Arts. 2294, 2295 of the Civil Code do not apply to such cases. Such acts or omissions violate no legal right, nor do they involve any dereliction of legal duty or obligations. Courts of justice enforce civil obligations only—not spiritual ones.

Malice is of the essence of slander. Unless it be alleged, no action can be maintained for a libel.

A corporation cannot maintain an action for slander.

The Spanish ecclesiastical laws have no longer any force in this State.

The relation between a bishop and the wardens of a church implies no civil contract, and consequently gives rise to no civil obligation. It is not a "contract

having for its object the gratification of any intellectual enjoyment, whether in religion, morality, or taste, or any convenience or other legal gratification," within the meaning of art. 1928, §3, of the Civil Code.

The right to nominate a curate, or the *jus patronatus*, of the Spanish law, is abrogated in this state.

The wardens of the church of St. Louis of New Orleans are authorized to administer the temporalities of the church, and are responsible only to their constituents for the manner in which they may administer them. They cannot compel the bishop to institute a curate of their appointment ; nor is he, in any legal sense, subordinate to the wardens of any one of the churches within his diocese, in relation to his clerical functions.

In framing the State Constitution of 1812, it was deemed unnecessary to insert any restriction upon the power of the legislature on the subject of religious sentiments or worship, as it had already been settled, by solemn compact, between the original states and the people of the territory, unalterable but by common consent, under the act of congress of 2d March, 1805, and in conformity with the ordinance of that body of 13th July, 1787, that religious freedom, in its broadest sense, should form the basis of all laws, constitutions and governments which forever after might be formed within said territory.

APPEAL from the Parish Court of New Orleans, *Maurian*, J.

The petitioners represent : " That by an act of the Legislature of the State of Louisiana, they were created, and are a body politic in fact and law, *de jure et de facto.* That the church of St. Louis of New Orleans, belonging to the said body politic, was built, finished and expressly appropriated to the use of the Catholic religion, in the year of our Lord one thousand seven hundred and ninety-four. That at that time the said church, destined to replace the parochial church of the same name which had been erected in New Orleans under the French government, was by competent authority, and with the consent of its founder Don Andres Almonaster y Roxas, who had caused it to be built at his own proper expense, erected into a cathedral, or principal church, to be the seat of a bishop's ministerial functions.

" That by the French laws, which were alone in force in Louisiana under the French government, until the establishment of the Spanish government, that is to say, until the possession which was taken thereof by O'Reilly, in the name of his Catholic Majesty, in virtue of the cession made by France, the rights of patronage which shall be hereafter defined, was recognized, established and consecrated as a right inherent to the property, in favor of every person who had built a church at his own expense.

That, at the time of the taking possession of Louisiana by and in the name of Spain, the French laws aforesaid ceased to have their effect therein, and were replaced by the Spanish laws which were then introduced. That the Spanish laws continued to be in full vigor in this country in all matters embraced in their provisions, as well under the territorial government as under our present State government, except in such cases where they might be contrary to the constitution of the United States and to the constitution and laws of the State of Louisiana, until the end of the year one thousand eight hundred and twenty-eight, at which time, such of the said laws as were known under the name of civil laws, were abrogated by a special enactment of the Legislature of this State. But petitioners maintain, that all that part of the said Spanish laws, known under the name of ecclesiastical laws, which is not repugnant to the constitution of the United States, to the treaties made in virtue of said constitution, to the laws of Congress, and to the constitution and laws of the State of Louisiana, is in full force and vigor to this day, in all matters relative to the temporal administration or discipline of the Catholic Church. That, by the ancient laws of Spain, the right of patronage above mentioned, was, for the same motives, the same as under the French laws. But that, by the laws of the Indies destined to regulate and govern the Spanish colonies in America, the said right of patronage was exclusively attributed and reserved to the King of Spain, with the express and formal prohibition under severe penalties, to any person or authority whatsoever, to arrogate to himself the exercise of said right directly or indirectly.

"The right of patronage thus attributed and exclusively reserved to the king consisted of what follows, namely :

"The king presented and nominated the archbishops, the bishops and other prelates to the Bishop of Rome, known under the name of the Pope, who approved said nominations, unless the nominees had not the qualifications prescribed by the canons, and gave to the nominees the institution necessary.

"The king nominated and designated to the archbishops, or to bishops, priests whom he destined to the service of all the churches; and those prelates were bound, except for good and legitimate

reasons duly proved, to grant to the said priests the canonical institution necessary for the exercise of the functions and powers of their office. And as petitioners have already remarked, the prohibition to assume the exercise of the said right of patronage extended to all persons secular or ecclesiastical, order, community, convent, &c. of any state, condition, quality or pre-eminence whatsoever.

" Petitioners here allege, that by the effect of the retrocession of Louisiana to France by Spain, the laws of France in ecclesiastical as well as other matters, were so far from being introduced in Louisiana by the taking possession thereof by the Prefect Laussat, that they were never promulgated therein ;' a formality which was indispensable according to the fundamental laws of the French republic then existing, to give them force or enable them to be executed. That consequently, and as it has always been recognized by our jurisprudence under the state, as well as under the territorial government, the Spanish laws, with the exception already mentioned, have continued to be in full force and vigor in Louisiana.

" But petitioners likewise allege, that the effect of the treaty of cession of this country to the United States could not be and has not been to reserve the right of patronage which the King of Spain had attributed to himself, as above set forth, and still less to transmit the same to any public functionary of the United States, or to any prince, potentate, or foreign government. That consequently the right of patronage has reverted to those persons in whom the same was vested by the Spanish laws existing prior to the laws establishing the royal patronage, and that said right may be and must be exercised by them in so far as the said right contains nothing unconstitutional. That by the laws prior to the royal patronage, which in itself is nothing but an encroachment, and the consequence of other encroachments of despotism over the liberties of the people, and a violation of the right of property and of the rights inherent to property, it was to the people, to the Catholics and to their clergy, that the right of electing and nominating their prelates, archbishops, bishops, &c. did belong, without any power on the part of the Bishop of Rome or his agents to meddle or interfere with the same, and without any

right or pretension on his part, short of an usurpation of authority, to elect the said prelates, archbishops, bishops, &c.; and likewise by the said laws prior to the royal patronage, the right of electing and nominating the priests destined to the service of the parochial and other churches, belonged to the owners of those churches, and was inherent in the property, and as such was transferable to their heirs and successors.

" Petitioners further allege that, in accordance with these principles, the Catholics of New Orleans ever since the year eighteen hundred and five, assembled together, took possession of the edifice called the Church of St. Louis of New Orleans, together with all the property thereto appertaining, and nominated among themselves administrators under the name of wardens, to administer all the affairs and revenues of the said church, together with all the property to the same belonging. That those wardens have faithfully discharged their duty, according to their mandate; that they did nominate the Reverend Father Antonio de Sedella, then curate of the said church, to continue to be their curate. That after said nomination, a certain Abbé Walsh, styling himself Grand Vicar, vested with the spiritual administration of the diocese of Louisiana, and claiming the right to nominate the said curate as belonging to himself in his said capacity, troubled and molested the said Antonio de Sedella in the possession of his office as curate; but that a suit having been brought by said Abbé Walsh as plaintiff, a judgment was rendered by the superior court of the territory of Orleans, which totally upset the pretensions of the said Abbé Walsh, and maintained the said Father Antonio de Sedella in the full possession and enjoyment of his office.

" That posterior to said judgment, about the year one thousand eight hundred and ten, another priest known under the name of Abbé Olivier, styling himself Apostolical Vicar, vested by the Bishop of Rome with the spiritual administration of the diocese of Louisiana, set up the same pretensions from which the Abbé Walsh had been debarred by the aforesaid judgment; that he endeavored to remove Father Antonio from his office, but that he dared not to resort to our tribunals to effect this end; and that finding that his assumed authority was not recognized, he contented himself with addressing to the General of the order of the

Capuchins in the island of Cuba a lengthy phillippic against Fa-ther Antonio ; which, were it not for the respect which is due to the dead, who must be allowed to rest in peace, might justly and deservedly be qualified as a defamatory, false, and slanderous libel ; the original of which was forwarded to Father Antonio himself by the said General of the Capuchins, whom the author of said libellous writing had requested to order Father Antonio out of his office, and retire to the convent to which he belonged in Spain. That until his death, which took place on the nine-teenth of January, one thousand eight hundred and twenty-seven, the said Father Antonio continued in full and entire possession of his office of curate, without ever being therein disturbed by the bishops whom it pleased the court of Rome to send to New Orleans. That at the death of the reverend and justly to be re-gretted Father Antonio, Mr. Rosati, bishop of the diocese, nomi-nated by the Pope, then exercised his episcopal functions in New Orleans ; that at the same time, Abbé Moni, who was one of the vicars of the parochial and cathedral church of St. Louis under Father Antonio, united the unanimous suffrages of the Catholics of New Orleans and was loudly and publicly proclaimed by all as the priest who enjoyed their utmost confidence, and as the worthiest, if not the only one worthy to succeed Father Antonio as curate of the said church.

"That in consequence of this manifestation of the popular will, and no doubt actuated by the praiseworthy intention of ac-ceding to the wishes of the Catholics, the said Bishop Rosati informed the wardens of the church of St. Louis, then in office, that he had elected or nominated Abbé Moni as curate to be the successor of Father Antoine ; and that said nomination, how-ever irregular under the existing laws, was approved by the said wardens in terms which clearly evinced the perfect understand-ing and good feeling then existing between the wardens and the bishop. That Abbé Moni remained in possession of his office of curate and discharged the duties of said office, until the day when he was compelled to relinquish the exercise of his functions by the disease which caused his death ; and that, at his request, Mr. Antoine Blanc, then and at the present time, bishop, nominated by the Pope, did designate another priest (Abbé Andeige) to fill

the office of Abbé Moni temporarily. That prior to that time, and consequently at the death of Abbé Moni, all the bishops who successively exercised their ministerial functions in this country, from the year eighteen hundred and twenty-six, without excepting Bishop Blanc, have received a salary from the wardens of the church of St. Louis paid to them out of the revenues of said church ; but that in January eighteen hundred and forty-two, the said Bishop Blanc being no longer satisfied with that salary, demanded, through the medium of a letter addressed to petitioners, the revival in his favor of a certain right known under the denomination of *Cuarta Episcopal*, that is to say, he demanded that one-fourth of the perquisites (casual) of the said church should be allowed him, over and above his salary.

" That petitioners thinking they were not authorized to grant that demand did not accede thereto, and that they subsequently suppressed the said salary under the conviction that, in allowing the same the wardens had overstepped their powers; and because inasmuch as Bishop Blanc never preached, although the canons and laws of the church made it his duty to preach, he did not render to the church of St. Louis services equivalent to the said salary.

" That, at the death of Abbé Moni, the office of curate of the church of St. Louis having become vacant, Bishop Antoine Blanc, setting up again the pretensions of Abbés Walsh and Olivier, which should not be countenanced inasmuch as the question had already been decided by a judgment, took upon himself, by virtue of his episcopal authority, to confer, *pleno jure*, and without consulting the wardens, the office of curate of the said church of St. Louis on a certain Abbé Roussilon, his personal freind—a foreigner, a priest unknown to the wardens, and who had no claim to their confidence; that for that reason, and because they could not recognize in the bishop the right of nomination, the right of patronage which is inherent to the property, they, the wardens, rejected said nomination.

" That said rejection was immediately followed by the publication of a pastoral letter of the said bishop, menacing the wardens of said church with ecclesiastical censure and penalties, and hinting at excommunication for being schismatic, if they persisted in

their resistance to his episcopal authority.    That notwithstanding the aforesaid pastoral letter, the wardens being satisfied that, according to the constitution and laws of this State applicable to the subjects in controversy, as well as according to the laws of France and Spain, which have not been abrogated and are yet in force, they could not surrender one of their most important privileges and franchises to an authority which, except in matters of dogma and faith, is not recognized in this State, and emanates from a foreign power, refused to submit themselves to the arbitrary pretensions of said bishop.

"That in this situation of affairs, wishing to avoid as much as possible the continuation of the conflict of pretensions at war with the peace of the church, the wardens consented to accept as their curate another priest, known by the name of Maenhaut, who was designated by the bishop; but that in consequence of the arrogation of certain pretended rights on the part of said Maenhaut, and which your petitioners could not admit, the said Maenhaut abandoned his functions of curate and withdrew to the bishopric (à l'eveché.)    That the said bishop encouraged the said Maenhaut in the steps aforesaid, and·had no doubt advised, and at all events approved, the assumption of the powers which were contested on the part of said wardens ; that afterwards all the priests attached to the church of St. Louis were by the authority of said bishop withdrawn from said church, whereby said church was deprived from the second of November, eighteen hundred and forty-two, of all religious service, and your petitioners were disabled from discharging the duties imposed upon them by their office, to the great scandal of the public, and to the detriment and damage of said church, and of your petitioners.

" That afterwards the true Catholics of this city having met with a view to put an end to the troubles which agitated the public mind, and to effect a good understanding· between the bishop and the church wardens, a committee composed of fathers of families and other good Catholics, was appointed by said meeting for the purpose of conferring with the respective parties, to obtain from them mutual concessions, by means of which it was hoped that peace would be re-established.    That the result of

Wardens of the Church of St. Louis v. Blanc, Bishop.

said measures was an agreement by which the bishop renounced his arbitrary pretensions, and consented to nominate a curate subject to the approval or disapproval of the wardens. That in consequence of said understanding, the bishop presented the Abbé Roussilon, who was rejected by the wardens. That shortly afterwards, and in virtue of the same agreement, the bishop nominated another priest, known by the name of Bach, whose nomination was approved by the wardens on the twelfth of January, eighteen hundred and forty-three. That said priest Bach took possession of his office of curate, to which however the wardens would not have consented, if they had anticipated that it was his intention to dictate to them other and new conditions, as he afterwards attempted to do, such as to give to the bishop the power of approval or rejection of the tariff—the resolution or deliberation of the wardens fixing salaries or perquisites of the priests employed in said church. That said pretensions on the part of said Bach having been rejected by said wardens, said priest continued in possession of his said office until he died, on the nineteenth day of September last.

"That when said curate Bach died, Bishop Blanc was absent from New Orleans; that the other priests attached to the church of St. Louis remained in the discharge of their functions until they were all, with the exception of one, withdrawn from said church by the bishop, in execution of the unlimited powers which he arrogated to himself; and for the purpose of compelling your petitioners to an absolute surrender of their rights, franchises, powers and prerogatives, as Catholics, and as free citizens of the United States, who can recognize no other sovereignty, except in matters of religious dogma, than that of the government under which they live. That on the return of said bishop to New Orleans, and as soon as he was informed of the death of the curate Bach, he stated in a letter written to your petitioners, that it became his duty to consider and select from among his priests, the one best calculated to fill the vacancy occasioned by the death of the venerable curate Bach ; that said letter is dated on the tenth of October, eighteen hundred and forty-three, in which he likewise states to your petitioners : ' One consideration has prevented me until now, from stating to you

the choice which I have made, and in order to obviate the same troubles which during fifteen months afflicted the Catholic community, and which must have been as painful to you as they were to me, I have thought that it was necessary to determine in a precise manner what will be the condition of the priest whom I shall place, or appoint, as curate of the cathedral. This, it appears to me, is the only means of putting an end to all difficulties. In order that a priest should exercise his functions of curate of the cathedral with dignity and propriety, it is necessary that he should have in his power the records for which he is responsible both to families and to his bishop ; that he should have the control and choice of the officers and assistants in the interior of the church, so that he may exercise his ministry without hindrance; that the free use of the presbytery should be secured to him in such a manner as to be master in his own house; and finally, that the tariff or fee bill which is to be followed by the clergy should be subject to the approbation of the episcopal authority.' The bishop concludes his letter in the following words: ' These propositions being made for the sole purpose to put an end to all difficulties, I think that you will at once accede to them. As soon as your acquiescence is communicated to me, I will at once inform you of the choice which I have made. I have the honor to be, &c.'

" Your petitioners further represent, that they could not but be surprised at the extraordinary conditions which the bishop attempted to dictate to them, and which he required them to accept, in order to obtain the nomination of a successor to the curate Bach, whose death had deprived the church of St. Louis of its pastor. But such was the extraordinary character of said conditions, that they were compelled to withhold their assent thereto. Resolutions to which effect being passed were communicated to the bishop. That they could not accede to the pretensions set up by the bishop, without transcending the powers delegated to them by the charter under which they act. That it is erroneous to say that the records of the church are in the exclusive custody of the curate, and that he is responsible for them as such to the families and to the bishop. That if by the register, the bishop means or understands the register of baptisms and marriages,

these documents, whilst they contain proof of the administration of sacraments in virtue of the laws of the church, are at the same time the proofs and title of the civil condition of the Catholic citizens, by means of which their filiation, their paternity, their legitimacy or illegitimacy is to be established; and to confide such records to the exclusive custody of the curate would be to constitute him a public officer, which cannot be done except by that branch of the government in which such powers are vested.

"That as regards the register of baptism and marriage, as they are considered under the laws of this State, the bishop, not being a competent judge of the question of legitimacy, filiation or paternity, nor of the validity of marriages, cannot pretend that the curate is responsible in any manner towards him in relation to said register.

"That as regards the lodgings of the curate, although the act of incorporation does not impose on the petitioners the obligation to furnish them, there has never been any objection on their part that he should be accommodated with a proper set of rooms in the same manner as his predecessor, and with which all his predecessors have been perfectly satisfied.

"That with regard to the right claimed for the curate to have the choice and control of the officers and other persons employed in the church, your petitioners would have had no objection thereto, if the curate appointed or to be appointed was only to be subject to the spiritual jurisdiction of the bishop, and independent of him in all other respects; but that your petitioners are fully authorized to conclude from the acts and doings of said bishop, that it is his intention to make the curate a mere tool of his own, subject to his orders in all matters whatever, whereby he intends to make himself the absolute master of the church of St. Louis. For which reason, your petitioners have been compelled to withhold their assent to the conditions attempted to be imposed.

"That in relation to the tariff, the conditions of the bishop are entirely inadmissible; that by the sixteenth section of the charter above referred to, full power is vested in the petitioners to fix the emolument of the curate as well as of other priests, and to determine the perquisites to which they shall be entitled. And your

petitioners aver, that the authority now claimed by the bishop to exercise the veto power over the acts of your petitioners with respect to this matter, is not sanctioned by any law. That the attempt of the bishop to impose such a singular condition is in reality only a second effort to obtain the *Cuarta Episcopal*, which he had already in vain attempted to obtain before.

" Your petitioners further represent, that after said bishop had been notified that his propositions had been rejected, he addressed them a letter, dated the twenty-second of October last, in which he states, that if they persist in said resolution, all connection between him and them shall cease, by which he clearly intimates that unless his extravagant pretensions are recognized by your petitioners, no curate shall be appointed for the church of St. Louis. That in the letter last referred to, the said bishop endeavors to justify his various pretensions by an elaborate discussion, and with a view to induce the wardens to accede to his demands, and concludes by notifying to them that he will always assert the exclusive right and privilege of appointing all curates and other ecclesiastical dignitaries, which he pretends is guarantied to bishops by what he calls the common ecclesiastical law, which common law is nothing else than what the European canonists, jurists and bishops have always denominated the *ultra montane law*, or otherwise the purely Papal law, which has never been in force either in Spain or in France, nor in the American colonies, and has at no period been in force in this State; but has, on the contrary, always been resisted and repudiated by the prelates and dignitaries of the church in those countries where an attempt has been made to introduce it. That, on the first of November instant, the wardens informed the bishop, through their president, that they could not acknowledge his unfounded and preposterous pretensions ; informing him at the same time that, in the exercise of their right of presentation, (*droit de patronage*,) resulting from the Spanish ecclesiastical laws, which are still in force in Louisiana so far as not inconsistent with the positive constitutional and statutory laws of the State, as well as from the acts of incorporation, they have nominated a priest to the curacy of the church of St. Louis : that on the third of the same month the said bishop addressed a letter to the president of said wardens, in

which he declares, that he cannot, and will not acknowledge the right of said wardens to make said nomination, relying on a brief or rescript of Pope Leo XII., as evidence of his own right and as the only guide to be followed by him as bishop, and stating that he should consider as schismatic any priest who should exercise his functions in the said church under said appointment, which he pretends is radically null; and alleging that it is impossible for him to approve said nomination, which he calls an act of schism on the part of said wardens, and apprising them that henceforward the priests officiating in said church, as well as those attached to the obituary chapel, shall cease to be in the pay of your petitioners; and concluding by accusing them of endeavoring to destroy the unity of the Catholic Church, and stating at the same time, that he reserves to himself the right of withdrawing, employing, and changing the priests appointed by him to officiate in the church of St. Louis, according to his own will and pleasure.

" And your petitioners further represent, that the language thus used by the bishop is indicative of an intention on his part to secure to *himself* a despotic and absolute authority, under the specious pretext of serving the interests of religion, and by that means to extend the secular influence of the court of Rome over this republic, in violation of all our laws and usages, and in violation of our religious liberty, and to make the *dicta* of the court of Rome, even in temporal matters, paramount to the constitution and laws of this State.

" That fully convinced of the inevitable tendency of the pretensions of said bishop, and being unable without being guilty of a dereliction of duty as Christians and as freemen, and without violating the principles of the federal and state constitutions, to recognize and admit said exorbitant pretensions, they have always deplored, and still sincerely deplore the inconceivable and blind obstinacy with which said bishop persists to uphold said pretensions, and especially the violent and unchristian temper which he displays in denouncing your petitioners and their acts as schismatic, when in reality they have done nothing more than exercise their unquestionable right of presentation (*droit de patronage*,) which right consists simply in presenting to him a

Catholic priest to fulfil the functions of curate of the church of St. Louis, leaving him at the same time his episcopal right to reject said presentation, if the nominee do not possess the qualifications required to receive from him, the bishop, the canonical institution, without which the wardens acknowledge that such priest could not be admitted to exercise his functions in said church.

" Your petitioners further represent, that they are proprietors of the said church of St. Louis, and have acquired the ownership thereof by uninterrupted possession for more than thirty years; that they and their predecessors ever since the year eighteen hundred and five, have been in possession as owners of said church and of the other property appertaining thereto ; by which possession they are entitled to claim said church and property by the prescription of thirty years.

" That, in their capacity of owners, your petitioners and their predecessors have administered the temporal affairs of said church and with the revenues thereof, which in the beginning were very inconsiderable, they have kept all the buildings in a proper state of repair, built the principal steeple of the church, and constructed the gallery known as the tribune. That when, in eighteen hundred and five, the first church wardens elected by the Catholics, took possession of the property and commenced the administration of the affairs of said church of St. Louis, the real estate belonging to it consisted in a space of ground situated on the left side of said church, and comprised between Chartres, St. Anne, Royal, and the continuation of Orleans street; that said space of ground was at that time covered with small buildings of brick and wood of little or no value, and yielding but a small revenue ; that the large building which is in part opposite the *Place d' Armes,* had only been commenced, and in the imperfect condition in which it then was, being only raised to the first arches, was used by being temporarily covered with boards by the person to whom it had been rented, and produced only a small annual rent. That your petitioners and their predecessors have caused to be constructed on the whole of said space of ground, all the brick buildings several stories high with which it is now covered, fronting on St. Anne and Royal streets and on the place

called St. Antoine ; that the presbytery fronting on St. Antoine Place has likewise been built by your petitioners ; that before this last mentioned house was erected, and up to the time of the death of the reverend Father Antonio de Sedella, there was nothing but a small frame house in which this worthy pastor resided, and he was the only priest attached to said church who was lodged at the expense of the church. That the large building referred to, fronting on the Place d' Armes, has been finished and completed by your petitioners according to its original plan, and distributed in such a manner as to be conveniently occupied at first by private individuals, and afterwards by some of the courts of justice in this city. That when the public desired that all the courts sitting in New Orleans should be held in the same building, your petitioners, both with a view to conform to the public exigency, and to derive a certain annual revenue from said property, caused important additions and alterations to be made to and in said building, so as to afford convenient halls for the sessions of different courts, and for the clerks and sheriffs thereof.

" That the cemetery which was used by the said church being too small, and the police ordinances no longer permitting that interments should be made therein, your petitioners purchased for the use of said church, a large extent of ground to be used as a Catholic church-yard, not far distant from Rampart street, which cemetery is still used for the purposes aforesaid. That your petitioners did also purchase, for the use of the Catholics belonging to said corporation, a lot of ground situated on Rampart street, on which they have erected a small chapel or church called the Obituary Chapel, and also a convenient dwelling house for the priests officiating in said chapel.

" Your petitioners further represent, that notwithstanding all the foregoing facts and acts of proprietors and patrons, and in opposition to the laws of this State, and with the sole view to supersede said laws by the rules of discipline of the Roman church called the common *ultra montane* law, the Bishop Antoine Blanc contests the right of your petitioners to do or perform any act either as patrons vested with the right of presentation, or otherwise, in the nomination of the priests charged with the performance of religious service in the church of St. Louis, as well as in the said obituary chapel. That by his conduct, and the influence which

his station gives him over the minds of a large number of persons incapable of drawing aclear distinction between the cause of religion and its ministers, and between that which belongs to the dogma or faith of the Catholic religion, and those laws which only regulate its discipline, the bishop has caused a deplorable division of opinion among the Catholic population of this city, although it was his bounden duty to use every effort in his power to preserve harmony, good feeling, benevolence and charity.

"That said division has reached to such a point, that recently a certain number of persons calling themselves the representatives of the Temperance Society, generally unknown to your petitioners, but probably Catholics, have published a vote of censure or disapprobation, conceived in harsh and insulting language, of the conduct and pretensions of your petitioners, and, at the same time, approving the conduct and pretensions of the bishop, declaring that they recognized them as just and legitimate, and offering their aid and assistance to maintain him (the bishop) in the exercise of his said pretensions.

" That to the great regret of your petitioners, the said bishop has addressed a letter to the representatives of said Temperance Society, published in one of the newspapers of this city, in which letter said bishop, without regard to the consequences which might flow from such a step, approves of the sentiments expressed by those individuals, and offers them his thanks. That said bishop, relying on the proffered support of said society, and regardless of the evils which may be occasioned by exciting a degree of exasperation and discontent which may become fatal to the public peace, has finally withdrawn from the church of St. Louis, all the ministers of the Gospel attached to said church since the death of the late curate, with the exception of Father Assencio, whose exertions, notwithstanding all his zeal and learning, are inadequate to the spiritual wants of the Catholics of the church of St. Louis, which consequently is deserted.

"Finally, your petitioners represent, that by reason and in consequence of the inadmissible pretensions of the said Bishop Blanc, as well as by his refusal either to recognize the right of nomination or presentation of your petitioners, or to exercise said right

of nomination himself, subject to the approbation of your petitioners, as it has been done during the time of Bishop Rosati, in pursuance of the compromise or agreement made between said bishop and a committee of Catholics referred to above, and also by the withdrawal of all the priests from said church except one, your petitioners have suffered and sustained and are suffering and sustaining damage to a large amount, which damage has increased by the effect of the libellous and defamatory letter which the bishop has written and published as aforesaid, in which he stigmatizes their acts as schismatic, and as tending to destroy the unity of the Catholic Church, all of which is false, injurious and calumnious; that said damages amount to at least twenty thousand dollars.

"Your petitioners allege, that it was the duty of the bishop, living under the protection of the laws in force in this State, to submit himself to those laws, either as an alien, if he is not a citizen of the United States, or as an American citizen, if he has been naturalized and taken the oath of allegiance ; inasmuch, first, as the right of presentation or election, in virtue of which priests are appointed for the service of the church, only appertains to the discipline, and has no reference either to the sacred dogmas or to the articles of faith of the Catholic religion : second, as in matters of patronage or election, each Catholic state or government has, and may have, its own laws different from those of the court of Rome, and that, without in the least encroaching on the spiritual jurisdiction of the Pope : third, as, if the said bishop is a naturalized citizen of the United States, he could not, without violating his oath of allegiance, invoke as the only rule of his conduct, either a bull or a brief, or any other sort of law or decree emanating from the Holy Catholic See, in matters relative to discipline or temporal affairs, or in any matter not purely spiritual ; especially, when such a course of conduct, or the acts resulting therefrom, affect the rights, prerogatives, franchises, and liberty of his fellow citizens.

"Your petitioners therefore pray, that the said Antoine Blanc, bishop, residing in the city of New Orleans, within the jurisdiction of this honorable court, be cited to appear and answer this petition ; that after due proceedings had, judgment be rendered

in favor of your petitioners against the defendant for the aforesaid sum of twenty thousand dollars, as damages by them sustained, with interest and costs of suit.    And your petitioners further pray, that it may please the court to order and decree in their favor, such other remedy and relief as the nature of their cause and the particular circumstances of the case may require and as the law will permit; and as in duty bound, they will ever pray, &c."

The defendant excepted to the petition, alleging : "That by law, and by the charter of the corporation, it is an aggregate one, composed of two distinct and integral parts, to wit, of one clerical or ecclesiastical member, and of twelve lay members.    That the curate of the church of St. Louis is, by virtue of his office of curate, a distinct, clerical and integral part of said corporation, and without whose existence, presence, assent and assistance, the said corporation is incomplete, and incapable of exercising its corporate functions, or of instituting or prosecuting this action, or of standing in judgment therein.    That it appears from the petition, that the office of curate of said church is now, and was at the time this suit was instituted, virtually vacant, or in abeyance, and that no person was then, or is now in existence, or recognized by the lay members of said corporation, as lawfully holding that office, and capable of deliberating upon, or assenting to, the acts of the lay members of the corporation.    That this action was commenced, and is prosecuted by said lay members alone, without the participation, knowledge, or concurrence of the clerical member of said corporation, and without his having had the means of joining in the deliberations thereon, or of expressing his assent or dissent, by vote or otherwise.

"That, by the charter of the corporation, the powers and duties of the plaintiffs are restricted to the administration of the property and revenues of the said church of St. Louis, which is a local, special, and particular church ; and that no power is given to them to regulate, or in any manner interfere with, the doctrine, discipline, or government of the Catholic Church, in its general or universal character as a church.    That it is not alleged in the petition, that this action is founded on, or that the damages claimed therein arise from, any injury to, or detention of, the

property, moneys, or other things belonging to the temporalities of the church, by law confided to the administration of the plaintiffs, or placed in their possession, or under their control.

"That no cause of action is set forth in the petition which can entitle the plaintiffs to recover of the defendant any actual damages in money ; the cause of action therein set forth being founded on the alleged opinions of the defendant, in relation to the government and discipline of the Catholic Church within the diocese of Louisiana, of which diocese the defendant is the lawfully constituted bishop, and which he submits is not a cause for damages, or for any action at law, or for which the plaintiffs are entitled to any satisfaction in money.

"Finally, that the petition sets forth no cause of action, of which the court can, or ought, to take cognizance." Wherefore the defendant prays that the petition may be dismissed.

The judge of the Parish Court sustained the exceptions, and dismissed the petition, being of opinion, that the curate forms a separate and integral portion of the corporation, and that, during a vacancy in that office, the corporation cannot act. He also sustained the exceptions on the ground, that no action for damages, founded on the refusal of the bishop to give his ecclesiastical sanction to the nomination of a curate made by the wardens, or to nominate one himself, could be maintained, it being, in fact, an action against the bishop to recover damages for his disagreement with the wardens, in regard to a matter of doctrine or church discipline. The plaintiffs appealed.

*Soulé*, for the appellants. This case comes up on exceptions which embrace all its merits. All matters of fact and allegations in the plaintiff's petition must be taken for granted. The only question for this court will be whether from the nature of the case which the plaintiffs exhibit, and from the capacity they have assumed, the present suit can be maintained.

The defendant contends, that the corporation created by the act of 1816, being composed of a curate and of six lay members, who were afterwards increased to twelve, consists of two distinct and integral parts, which cannot cease to co-exist, without an actual dissolution of the whole ; and he insists that the office of curate being actually vacant, the corporation has virtually ceased to exist, and that therefore the present plaintiffs are incapable of suing in its name and behalf.

Is then the corporation of the church of St. Louis actually composed of two distinct and integral parts? ' Is the curate any thing but a warden? Does he possess any privilege which contradistinguishes him from the other wardens; or is he vested with any separate power, authority, or control, which at all support the character claimed for him by the defendant, of constituting alone, such a distinct, integral, and so important a portion of the corporate body, as to annihilate it, the moment he ceases to act his part? The proposition is preposterous.

It is said, that the act of incorporation which provides for the election of the lay members, has no provision for the appointment of the curate; that his nomination remains independent of the powers conferred by the Legislature, &c., &c. Is that any proof that the curate constitutes a distinct and integral part of the corporation? The law says, on the contrary, that he shall, with the other members, (the lay members,) form a body politic, styled *the Wardens of the church of St. Louis of New Orleans*. (Moreau's Digest, vol. 1, p. 200, § 1.) Thus he is made a warden, and is in all respects assimilated to the other wardens, being in no manner contradistinguished from them, except so far as he takes his seat by virtue of his office, and is not, like the others, submitted to the ordeal of an election.

If he were intended to constitute by himself a distinct and integral part of the corporation, why is he totally disregarded by the 10th section which provides, that the affairs of the corporation shall be managed by a majority of the wardens? Could that be the case, if he were a distinct and integral part of the corporate body? In what is the curate distinct from the other wardens, when the interest of the corporators are to be administered?

The mayor and aldermen of the city of New Orleans constituted once a corporation composed of distinct and integral parts. But then each of those parts had an independent corporate existence; each moved in its own separate circle, and although they were but the portions of a whole, they were not merged in each other so as to destroy all distinction, and the action of both was necessary for the legal action of the whole. Not so with the present corporation;—it is not styled the *Curate and Wardens*, but *the Wardens of the church of St. Louis, &c., &c.* The action of the two alleged distinct and integral parts, is not required for the legal action of the whole. On the contrary the management of the common affairs is left with the majority of the wardens, and the acts of the majority are, to all intents and purposes, the acts of the whole corporation.

The wardens of the church of St. Louis constitute, and are in fact an aggregate corporation, but not a corporation composed of integral and distinct parts.

We are next to consider, whether the powers assumed by the wardens are such as are given to them by the act of incorporation. The defendant alleges, *that being instituted only to administer the temporal concerns of the church, the wardens cannot exercise any control over its doctrine, discipline or government, or its general or universal character as a church.*

It is conceded, that the wardens are exclusively vested with the power necessary to administer and govern the temporalities of the church ; but they are denied all kind of control beyond the actual disposition of the revenues of the *fabrique.* They are vested by the 10th section of the act of incorporation, with full and ample authority *to provide in a suitable manner, for public worship ;* and this not only includes the right, but imposes the obligation, to secure a priest to be the curate of the church.

Many ceremonies of the Catholic religion cannot be accomplished without a curate; and the power to provide for public worship would become nugatory, without a power to procure the proper minister who could perform it. Can it be said, that at the same time the wardens are to provide for public worship in a suitable manner, they shall be precluded from all authority to procure the very officer without whom the worship is impossible ; or does the act of incorporation intend, that the nomination of such an officer should be left at the mercy of an authority, which could put its provisions at defiance ? Clearly not.

The appointment of a curate was at all times, a temporal concern too intimately connected with the well being, peace and harmony of the Catholic fraternity, to be effected without their will, choice or assent. The moral and intellectual qualifications of the clerical officer to be appointed, the orthodoxy of his creed and doctrine, those theological endowments which might recommend him as a proper minister in whom confidence could be placed, and on whom the sacred orders might be safely conferred, may well be claimed as falling within the spiritual authority of bishops, archbishops or popes, without impairing in any manner the right of the Catholic body to choose their pastors ; just as with us, although the power to grant a lawyer his license be with your Honors, the right of selecting him as advocate in a cause, remains with the client. The office of curate is a benefit, (*beneficium,*) derived not from the heads of the church, who have only to decide on the canonical qualifications of the priest appointed, but from the individuals or corporations who provide for his maintenance and pay. By the canon laws, the presentation of the curate must come from the patron, (*a patrono,*) while the bishop only institutes him ; and thus is left to those who confer the benefit, and provide for its maintenance, the natural right of select-

ing the beneficiary. The donor is permitted to choose the donee ; on the other hand, the spiritual privileges are respected, by leaving with those who are entitled to claim the same, full liberty to exercise them according to the mandate of the church and to the dictates of their consciences. The bishop is bound to approve the selection, unless good cause be by him shown to the contrary.

It is alleged on behalf of the defendant, that the matters in litigation, being in their nature spiritual, cannot become the subject of a suit for damages.

The constitution of the United States is invoked in support of the position assumed in this exception; and the authority of our most celebrated judges and jurists quoted to maintain what is by no means denied, viz : that the defendant has an indisputable right to follow, as to his understanding and conscience may seem best, the tenets of the religion which he professes, and that such right cannot be abridged by legislation nor by the interposition of the judiciary.

What do the plaintiffs complain of ? Not of any heterodox doctrine which the bishop may entertain and profess, nor of the manner in which he may be pleased to follow the tenets of his creed, nor of any rules which he may choose to impose on those who are under his spiritual authority, nor of his refusing the holy sacraments to the upright and virtuous, nor of his awarding them to the profligate and corrupted . . . . . . . . These indeed are admitted to be matters between his conscience and his God.

But the plaintiffs complain of his dereliction of duty towards the corporation they represent—of his non-compliance with the obligations which he contracted when he consented to become their bishop, and whereby he was bound, amongst other things, to grant his institution to the curate presented, unless there should be some obstacle,—*modo nihil obstet.* They assert and maintain that, being vested with the right of patronage, which is a real one, belonging to those who build a church, and inherent to the right of ownership, they are by law entitled to be protected in its exercise. That it is a civil right—*verum in jure civili jus patronatus,* (Devoti, vol. 1, p. 242,) and that it can be enforced by the civil tribunals.

Our religious rights are a sacred property, in the enjoyment of which we are to be protected ; and if so, who will deny that damages may be recovered, *for the breach of contract having for its object the gratification of an intellectual enjoyment, whether in religion, morality, &c.* Civil Code, art. 1928, No. 3.

That religious rights and privileges, immunities, franchises, discipline and government can be the objects of civil legislation, is taught by all constitutional writers. That the power to legis-

late on that subject, which was denied to the general government, has been retained by the States, is not a question. Story on the Const. vol. 3, pages 722, 723, 730, 731.

Is not a contract between the bishop and the congregation of those on whom he undertakes to exercise his authority, as binding as that of a client with his lawyer, as that of a patient with his physician, as that of a parent with the director of a college or the rector of an academy ?

The facts and asseverations in the petition are to be taken for granted. The plaintiffs assume, that the Rev. A. Blanc, in assenting to become bishop of New Orleans, undertook towards the Catholic congregation certain obligations, which constitute his part of the contract entered into with them. That on their side, they assumed to do and perform certain things, and to accomplish certain obligations, which they have done, performed and accomplished ;—but that the bishop has not only failed to do what he was bound to do, but actually impedes them in the gratification of their dearest intellectual enjoyment, to wit, that of having the ceremonies of their religion and public worship performed; in consequence of all which, they suffer damages to the amount claimed.

But the defendant insists, that this is not a question of which the civil tribunals can take cognizance. It must be admitted, that wherever there is a contract, there are obligations created, the non-performance of which gives necessarily rise to the adverse right of claiming indemnification therefor. That it was in the contemplation of the authors of our Code to apply those principles to cases like the present one, cannot be seriously contested. Art. 1928, § 3, of the Civil Code, provides, that where the *contract has for its object the gratification of some intellectual enjoyment, whether in religion, morality or taste, or some convenience or other legal gratification, although these are not appreciated in money by the parties, yet damages are due for their breach. A contract for a religious or charitable foundation, a promise of marriage, or an engagement for a work of some of the fine arts, are objects and examples of this rule.*

The duty of the bishop to institute the curate appointed is asserted by the plaintiffs : the assertion remains uncontradicted, and under the pleadings must be taken for granted.

If the bishop be bound to discharge this duty, and we have succeeded in showing that it was an obligation contemplated by the law, then the exception is disposed of.

That the civil tribunals of Europe, at a time when there was no legislation on the subject, asserted their authority to meddle with such matters, as far as they affected individual rights, can easily be shown. " *Richer*," says Dénisart, vol. 1, p. 73, " *cite une*

*multitude d'actes émanés des cours de justice en France, sous les rois de la troisième race, pour repousser les entreprises des ecclésiastiques et leurs vexations. Il rapporte entr'autres un arrêt qui condamna l'évêque de Meaux à exhumer et mettre en terre sainte un certain Poncet, que son official avait excommunié pendant procès, au préjudice de défenses existantes, et qui comme excommunié avait été inhumé en terre profane."*

I haves hown from Johannes Devoti, that the right of patronage was a civil one. *Verum in jure civili jus patronatus.* Vol. 1, 392. Fevret, in his treatise, *ex professo,* on the subject of abuses (*abus,*) shows most conclusively, that the appointment of the curate is a civil right on the part of those who appoint, and his institution a civil obligation on the part of the bishop approving the nomination. Fevret, book 1st, chap. 3, pages 22, 23, No. 3.

The question before the court is purely civil ; it originates in the non-compliance, on the part of the defendant, with a solemn contract, and in a breach of obligations intended to secure to the plaintiffs the *gratification of a religious enjoyment.*

*Canon,* on the same side, cited the act of 7 March, 1816, incorporating the plaintiffs, ss. 1, 2, 3, 9, 10, 15, 16 ; and the amendatory acts of 22 March, 1822, 6 March, 1830, and 11th March, 1837. Vattel, Droit des Gens, lib. 1, ch. 10, Nos. 127, 129, 139 to 146, 150, 151. St. Louis' Pragmatique Sanction, art. 2. (Paillet, Droit Public Français, p. 74.) Nov. Recopilacion, ley 6, tit. 17, lib. 1, vol. 1. Ley 1, tit. 18, p. 135. Merlin, *verbis,* Patronage, Bulle.

*Roselius* and *Mazureau,* on the same side.

*St. Paul,* for the defendant. The wardens cannot sue, because of the absence of an integral part of the corporation. Angell & Ames on Corp. 58. Black. Comm. book 1, 478, 488, *n.* 22. Rolle's Abridgment, *verbo,* Corporation. The act of 7 March, 1816, s. 1, shows that the curate is an integral part of the corporation. The powers of the wardens of the church of St. Louis are temporal only. See act of 1816, ss. 10, 11, 15, 16. The right of patronage is a spiritual one. Hericourt, Lois Ecclésiastiques, book 1, pp. 259, 275, 278, 203, 217. Journal du Palais, vol. 4, pp. 408, 430. Courts of justice have *no power to enforce ecclesiastical discipline.* See *Martin's case,* 4 Robinson, 62.

*D. Seghers,* on the same side. On the 13th July, 1787, Congress passed an ordinance for the government of the territory of the United States north-west of the river Ohio. This ordinance contains the following emphatic and solemn declaration : " And for extending the fundamental principles of civil and religious liberty, which form the basis whereupon these republics, their laws and constitutions are erected ; to fix and establish those principles as the basis of all laws, constitutions and governments, which forever hereafter shall be formed in the said terri-

tory; to provide also for the establishment of states and permanent governments therein, and for their admission to a share in the federal councils, on an equal footing with the original states, at as early periods, as may be consistent with the general interest:

"It is hereby ordained and declared by the authority aforesaid, that the following articles shall be considered as articles of compact between the original states, and the people and states in the said territory, and forever remain unalterable, unless by common consent to wit:

"Art. 1st.—No person demeaning himself in a peaceable and orderly manner, shall ever be molested on account of his mode of worship or religious sentiments in the said territory."

"Art. 5th.—There shall be formed in the said territory not less than three nor more than five states, &c.—And whenever any of the said states shall have sixty thousand free inhabitants therein, such state shall be admitted, by its delegates, into the Congress of the United States, on an equal footing with the original states in all respects whatever; and shall be at liberty to form a permanent constitution and state government; *provided the constitution and government so to be formed shall be republican, and in conformity to the principles contained in these articles.*"

The act of Congress, approved 26th March, 1804, for erecting Louisiana into two territories, and providing for the temporary government thereof, after having constituted the territory of Orleans, and vested the legislative power in the governor and legislative council, says, (sec. 4.) that, "their legislative powers shall also extend to all the rightful subjects of legislation; but no law shall be valid which is inconsistent with the constitution and laws of the United States, or which shall lay any person under restraint, burthen, or disability, on account of his religious opinions, professions, or worship, in all which he shall be free to maintain his own, and not be burthened for those of another."
Sec. 11. "The laws in force in the said territory, at the commencement of this act, and *not inconsistent with the provisions thereof*, shall continue in force, until altered, modified, or repealed, by the legislature."

Another act of Congress, approved March 2d, 1805, entitled "*An act further providing for the government of the territory of Orleans*," provides, "That the President of the United States is authorized to establish within the territory of Orleans, a government in all respects similar, (except as herein otherwise provided,) to that now existing in the Mississippi territory, &c. And that, from and after the establishment of the said government, the inhabitants of the said territory of Orleans shall be entitled to,

and enjoy all the rights, privileges, and advantages secured by the said ordinance, (of 13th July, 1787,) and now enjoyed by the people of the Mississippi territory."

The act of Congress, of February 16, 1811, entitled " An act to enable the people of the territory of Orleans to form a constitution and state government, &c.," provides, (sec. 3,) as follows : " Whereupon the said convention shall be authorized to form a constitution and state government for the people of the said territory ; *Provided, the constitution to be formed in virtue of the authority herein given*, shall be republican, and consistent with the constitution of the United States, *that it shall contain the fundamental principles of civil and religious liberty, &c., &c.*"

The 4th section provides, that said state constitution, when framed by the convention, shall be transmitted to Congress for its approbation or disapprobation, &c.

The act of Congress, of April 8th, 1812, entitled " An act for the admission of the State of Louisiana into the Union, and to extend the laws of the United States to the said state," provides, (sec. 1,) " that it shall be taken *as a condition upon which the said state is incorporated in the Union* that" all conditions and terms contained *in the third section* of the act, the title whereof is herein above recited, (the act approved February 16, 1811,) "*shall be considered, deemed, and taken fundamental conditions and terms, upon which the said state is incorporated in the Union.*"

If the ecclesiastical laws of Spain ever were in force in the province of Louisiana, (which is denied, as they were not promulgated by O'Reilly, nor by any other governor of the colony,) they ceased to exist the very moment the country passed under the sovereignty of the United States, for it would have been impossible to enforce those ecclesiastical laws, in the face of the emphatic and solemn declaration of the fundamental principles of civil and religious liberty, promulgated by Congress on the 13th of July, 1787.

Those fundamental principles of civil and religious liberty form an integral part of the constitution of the State of Louisiana, paramount to any other part thereof; as it is not in the power of the people of this state, nor of its convention, to alter, modify, or repeal them, without the consent of Congress, for they are the " *conditions upon which the state is incorporated in the Union.*"

BULLARD, J. The plaintiffs, suing as the Wardens of the Church of St. Louis of New Orleans, allege in their petition, that the church of St. Louis, belonging to them, was built, finished, and expressly appropriated to the use of the Catho-

lic religion. That it was, with the consent of its founder, and by competent authority, erected into a cathedral, to be the seat of a bishop's ministerial functions. That by the French laws, which were in force until the country was ceded to Spain, the right of patronage was recognized, established, and consecrated as a right inherent in the property, in favor of every person who had built a church at his own expense. That the Spanish laws, which superseded those of France, recogni-ed t e ie principle; and that the same laws, except so far as they are abrogated by the constitution of the United States and the constitution and laws of this State, remained in force until 1828, when such as were *civil laws* were repealed, leaving in fu l force those parts of the Spanish law known under the name of ecclesiastical laws, which are not repugnant to the constitution and laws, in all matters relating to the temporal administration of the Catholic Church. That the *jus patronatus* in the Spanish colonies in America, was expressly reserved to the King of Spain exclusively. That this right of patronage consisted in the right of the king to nominate and present the archbishops, bishops, and other prelates, to the Bishop of Rome, under the name of the Pope, who approved of the same, unless the nominees had not the qualifications prescribed in the canons, and gave the institution necessary. That the king also nominated and designated to the archbishops or bishops, such priests as he destined to the service of the churches, and those prelates were bound, except for good and legitimate reasons, to grant to such priests the canonical institution, necessary for the functions and powers of their office; and all persons, whether secular or ecclesiastical, were forbidden to exercise this right of patronage or presentation. The plaintiffs further allege, that the Spanish laws, with the exception mentioned by them, have continued in full vigor in Louisiana; and that the effect of the cession to the United States could not be, and has not been, to reserve the right of patronage, which the King of Spain attributed to himself, and still less to transfer it to any public functionary of the United States, or any prince, potentate, or foreign government. That by the laws which existed prior to this royal patronage, the people, the Catholics, and their clergy, had the right of nominating and electing prelates without

any power on the part of the Bishop of Rome, or his agents, to interfere ; and that the right to elect priests destined to the service of the parochial churches belonged to the owners of those churches, and was inherent in the property, and as such transmissible to their heirs or successors.   The petitioners then enter into long historical details, showing the practice in New Orleans, which it is useless here to repeat.   They allege, that the bishops, including Bishop Blanc, have always received a salary from them, paid out of the revenue of the church ; but that in January, 1842, the defendant, being no longer satisfied with that salary, demanded, by letter addressed to them, the revival in his favor of a certain right known under the denomination of *Cuarta Episcopal*, that is to say, that one-fourth of the perquisites (casual) of the said church should be allowed him, over and above his salary.   That the petitioners, thinking themselves not authorized to grant this demand, refused to accede to it, and subsequently suppressed the salary, under the conviction that, in allowing it, the wardens had overstepped their authority ; and that, as Bishop Blanc never preached, although the canons and laws of the church made it his duty to preach, he did not render the Church of St. Louis services equivalent to the said salary.   They next proceed to detail the troubles and disturbances which have occur red between them and the bishop ; and allege, that finally the bishop wrote to them, that he was ready to name a curate for the cathedral as soon as it was determined what would be his condition ; and saying that, in order that a priest may exercise his functions of curate with dignity and propriety, it was necessary that he should have in his power the records for which he is responsible to families and to his bishop ; that he should have the control and choice of the officers and assistants in the interior of the church, so as to exercise his functions without hindrance ; that he should have the free use of the presbytery ; and finally that the tariff to be followed by the clergy, should be subject to the approval of the bishop. . They say they refused to accede to these conditions, and they expose at length their reasons ; and allege, that the authority claimed by the bishop is not sanctioned by law.   Whereupon they were notified by the bishop, that if they persisted in their resolution, all connection between him and them

should cease; by which he intimates, that no curate will be appointed for the church of St. Louis; and in his letter he asserts the right to appoint all curates, and other ecclesiastical dignitaries, which he pretends is guarantied to bishops by what he calls the *common ecclesiastical* law, which law is nothing else than what the European canonists, jurists and bishops have always denominated the *ultra-montane* law, or otherwise, the purely Papal law, which has never been in force either in Spain or France, nor in the American colonies. That finally, he had refused to recognize the right of the wardens to make a nomination of curate; and declared, that he would consider as schismatic any priest, who should exercise any functions under such an appointment; and apprising them, that the priests officiating in said church, as well as those attached to the obituary chapel, shall cease to be in the pay of the petitioners, and charging the wardens with an attempt to destroy the unity of the Catholic Church. That he thus evinces an intention to make the *dicta* of the court of Rome, even in temporal matters, paramount to the constitution and laws of this State. They proceed to state, that the bishop, by his conduct and influence, has caused a deplorable division of opinion among the Catholic population of the city. That this dissension has arisen to such a point, that recently a certain number of persons, calling themselves the representatives of the Temperance Society, generally unknown to the petitioners, but *probably Catholics*, published a vote of censure and disapprobation, conceived in harsh terms, of the conduct and pretensions of the petitioners, and approving at the same time the conduct of the bishop, declaring that they recognize his pretensions as just and legitimate, and offering him their aid and assistance to maintain him therein. That the bishop addressed a letter to the representatives of the Temperance Society, which has been published, in which he approves the sentiments expressed by them, and offers them his thanks. That finally, he has withdrawn from the service of the church of St. Louis, all the ministry attached to the same, with the exception of Father Assencio, whose services are inadequate to the spiritual wants of the members of the church. The petition finally resumes, that by reason of the inadmissible pretensions of the bishop, as well as by his refusal to recognize their

right of nomination or presentation, or to exercise it himself, subject to their approbation, and by the withdrawal of all the priests from the church, except one, they have suffered, and are still suffering damage, which has been increased by the effect of the libellous and defamatory letter aforesaid, in which he stigmatizes their acts as schismatic, and as tending to destroy the unity of the church, all which is false, injurious and calumnious; and they lay their damages at $20,000, for which they pray judg-·ment.

Thus it appears upon an analysis of this petition, that the wardens of the church of St. Louis sue the bishop of the diocese of Louisiana, for damages, for having at first asked for the *Cuarta Episcopal*, in addition to his salary ; for having asserted the propriety of the tariff's being submitted to his approbation ; for having asked that the curate to be appointed should have the entire control of the records of marriages, &c., and the appointment of the subordinates who officiate in the church ; for having neither admitted the right of the wardens to appoint a curate, nor appointing one himself; for having written a letter to the Temperance Society, thanking them for their sympathy in his cause; and, finally, for having withdrawn from the service of the church all the priests except one, whereby the cathedral is deserted.   These damages are sought to be recovered of a prelate of the Roman Catholic Church, for having uttered these expressions of opinion, and avowed these pretensions to authority, and exercised these acts of discipline, in reference to the doctrines and government of the church of which he is a high dignitary, while acting in the discharge of his episcopal functions.

The defendant met this petition by four exceptions; the first of which is, substantially, that the corporation of the wardens of the church of St. Louis is an aggregate corporation, composed of two distinct parts, to wit, the curate of the church, and twelve lay members; and that the office of curate being vacant, as shown by the petition itself, it has not the faculty *standi in judicio*.   The second exception is, that the powers and duties of the church wardens are restricted to the administration of the property and revenues of the church of St. Louis, and that no power is given to them to regulate, or in any manner interfere with the

discipline or government of the Catholic Church, in its general or universal character as a church. That it is not alleged that any damage has been sustained by injury done to, or by the detention of any property of the church.

3d and 4th. That no cause of action is set forth in the petition, which can entitle the plaintiffs to recover; any such cause of action as therein set forth being founded on the alleged opinions of the defendant in relation to the government and discipline of the Catholic Church within the diocese of Louisiana, of which he is bishop; and finally, that the petition sets forth no cause of action of which the court ought to take cognizance.

These exceptions were sustained by the Parish Court, and the petition dismissed, and the plaintiffs have appealed.

We are not prepared to concur with the Parish Court in sustaining the first of these exceptions, which denies to the corporation the faculty of suing while the office of curate is vacant. We regard the curate as an *ex officio* member of the board of wardens, having but one vote, like any other member, in its deliberations, as the members of this court are, *ex officio*, trustees of some of the colleges in the State. If every seat here should become vacant, the college corporation would, in our opinion, continue to exist, with all its capacities to contract, to sue, and to be sued. This is more especially the case when the appointment of the *ex officio* member does not depend upon the other members, and no mode is pointed out by the charter for filling the vacancy. The question would be a very different one, if the lay members alone, without consulting the curate, were asking for a modification of the charter, as was the case in Pennsylvania, in relation to St. Mary's Church, which was cited during the argument. The management of the property of the church was confided by the charter jointly to the curate and the lay wardens; and the lay wardens alone, according to that decision, could not be permitted to procure such a modification of the charter as to leave out the curate altogether; but it does not follow that, even if there were a curate, this suit might not be instituted against his will, by a vote of the majority, nor that a mere vacancy in the office would be a good plea in abatement. The board is composed of thirteen members, of whom the curate is one, and, according to the Code,

the act of a majority is the act of the whole. Art. 435. But upon the other exceptions, our opinion is unequivocal and unanimous.

Assuming, then, every statement and allegation in the petition as true, can the plaintiffs maintain this action against the bishop?

The charges against him are, in substance, that he has interfered with and impeded the discharge of duties, and the exercise of powers belonging to the church wardens; that he has asserted pretensions unwarranted by law; that he has withdrawn the officiating ministers from the cathedral, by which means it is nearly deserted; and that he wrote a libellous letter to the members of the Temperance Society.

Our first inquiry necessarily is, what are the corporate powers and duties of the plaintiffs? We can learn them only from their charter, and as defined by law. It is to be remarked, in the first place, that although the curate is one of the wardens, *virtute officii*, yet no provision whatever is made by the charter for supplying a vacancy occasioned by his death, or resignation, or otherwise. The vacancy is supplied as soon as a new curate is appointed and qualified, according to the established doctrine of the Catholic Church; but how, or by whom, we are not judicially informed. Nor is there any general law on this subject; as we shall presently show, that the law cited from the 1st Partida, and the Recopilacion, relative to the right of presentation to a vacant benefice, or the *jus patronatus*, has been abrogated.

The ordinary corporate powers common to most corporations, are conferred by the 2d section of the act of 1816, entitled "An act to incorporate the Congregation of the Roman Catholics of the Church of St. Louis." The 10th section defines the powers and duties of the wardens. They are vested with full authority to provide in a suitable manner for public worship (*entretien du culte*;) for the salaries of the ministers and *employés*; to administer the revenues of the *fabrique*; to keep up, repair and improve the property thereto belonging; and to make and alter any ordinances relative to those objects, and all affairs which concern the temporalities, (*le temporel*,) of the said church. The 16th section authorizes the wardens to fix, on the third Monday in January of each year, the emoluments of the curate and of the other

ministers officiating in the public worship, and of those employ-ed in the service of the corporation, as well as the sums which the curate and other ministers shall have a right to exact under the name of *casuel ;* and they are forbidden to receive any high-er fees under a penalty of twenty-five dollars.

The title of this act is, "An act to incorporate the Congrega-tion of the Roman Catholics of the Church of St. Louis of New Orleans, and *to regulate the administration of the property and revenues of said Church.*" The corporators, those who have a voice in the election of lay wardens, are declared to be all white persons, aged at least twenty-five years, having resided at least five years within the parish of St. Louis, and paid a state, parish or city tax, and professing the Roman Catholic religion. They are the *constituents,* and the wardens are their *mandataries,* having by law a corporate name and capacity, the more effectu-ally to administer the temporalities of the church, and to provide for the support of public worship in the Catholic form. The charter does not give to the mandataries of the Catholic part of the community a right to appoint, in the theological sense of the word, a *curate,* but only to provide for his salary ; and we do not doubt their perfect right to withhold all salary from any per-son whatever, and even to prevent any person claiming to be curate, to enter the church belonging to the corporation. We ex-pressly so ruled in the case of *The Church of St. Francis of Point Coupée* v. *Martin,* 4 Robinson, 62, in which case the cu-rate claimed his salary, after he had been notified that it had been stopped and withheld. The Legislature have not, and could not in our opinion, authorize the wardens to interfere in matters of mere church discipline and doctrine. It could not constitution-ally declare, what shall constitute a curate in the Catholic accep-tation of the word, without interfering in matters of religious faith and worship, and taking a first step towards a church establish-ment by law. It would have as good a right to provide for the appointment of bishops, for the qualification of circuit riders, pre-siding elders, deacons, priests who officiate in the Jewish syna-gogues, and even for the election of the Pope.

The plaintiffs' counsel place their right to recover upon those articles of the Code so often quoted, which declare " that every

act whatever of man, which causes damage to another, obliges him, by whose fault it happened, to repair it," and that "every person is responsible for the damage which he occasions, not merely by his act, but by his negligence, his imprudence, or his want of skill." It is asserted that in consequence of the unfounded pretensions and acts of the bishop, the cathedral has been in a great measure deserted, and the income of the church greatly diminished ; and the petitioners thence infer their right to recover damages.

These articles are not to be understood in their literal sense, as applicable indiscriminately to all acts whatever, even to those for which the person committing them is declared by law not responsible—such acts do not violate any legal right, and involve *no dereliction* of legal duty and obligation. Men are liable in damages only for their *illegal* acts, and for injuries done to the legal rights of others ; and as this court said, in the case above alluded to, of *The Wardens of Point Coupée* v. *Martin, Curate,* " courts of justice sit to enforce civil obligations only ; they never attempt to coerce the performance of spiritual ones."

But the plaintiffs' counsel contend that the duties of the bishop are legal duties, and it was even asserted by one of them that he might be coerced to discharge them by the arm of the law, and by writ of mandamus. Nothing can be more plain and obvious than the principle laid down in the case above spoken of, "that neither the Pope, nor any bishop has, within this State, any authority, except a spiritual one." The highest prelate of the church, in common with the most humble worshipper, cannot be molested on account of his religious opinions, and the free expression of them. If the bishop entertains and expresses the opinion that he *alone,* in his episcopal character, has, according to the established discipline or government of the Catholic Church, a right to appoint a curate, he is not responsible to any man or body of men for expressing such an opinion. If, in the exercise of his spiritual functions, he has caused his subordinates to cease to perform divine service in the cathedral, it is an act for which he is not accountable to any human tribunal. The wardens might as well sue the worshipper himself for ceasing to occupy his accustomed seat in the church, because of a difference of opinion between

him and them as to the proper qualification of the curate. Admitting that the diffusion of the defendant's opinions has produced, as it is alleged, lamentable dissensions in the community, the plaintiffs were not appointed to maintain unanimity of opinion upon religious topics, much less to invoke the aid of the courts to enforce it. But it is said, that the bishop, being no longer satisfied with the salary which has been allowed him, asked through the medium of a letter addressed to the wardens, the revival of a certain right, known under the name of *Cuarta Episcopal*, that is to say, that one-fourth of the perquisites, or *casuel*, should be allowed him over and above his salary. It is not even insinuated that he retained, or attempted to retain the slightest part of that income, under such a pretence. On the contrary, his addressing himself to the wardens shows his opinion that they had a right to refuse it. If the Pope were to claim one-fourth of the treasury of the church, he would only be laughed at for his pains. Again, it is said, that the bishop published a pastoral letter menacing the wardens with ecclesiastical censure, and even *hinting at excommunication* for being schismatic, if they persisted in their resistance to his episcopal authority. And suppose he had excommunicated them, could the bishop be punished, or amerced in damages for regarding the wardens as schismatics according to his views of the doctrine and discipline of the church; and a court of justice be gravely called on to decide which was schismatic, the bishop or the wardens ? By what standard are we to ascertain the orthodoxy of the corporation, or of the bishop ? The whole matter would end in the most gross absurdity, as well as an attempt to violate the most sacred of human rights—an entire exemption from all responsibility on account of religious opinions. The letter to the Temperance Society, said to be libellous, is not alleged to be malicious, and malice is of the essence of slander; and besides, this is perhaps the first time that a corporation has brought an action for slander. It is precisely as if a *bank* were to sue a citizen for damages, for having asserted that its *directors* were rogues and peculators.

We proceed next to show upon what ground this exemption from liability on account of religious opinions reposes, and how far any former law in this State can be invoked to support a con-

trary doctrine, or any right to nominate a curate, as incidental to the ownership of the church.

The argument of the junior counsel of the defendant upon these questions of religious liberty and worship, met our entire approbation. Vatel, whose opinion was quoted by the opposite party, to prove that it is one of the attributes, as well as duties of the sovereign, to make suitable provision for a religious establishment and religious instruction among the people, lays it down as a maxim, that liberty of conscience is a natural and inviolate right; and he adds, it is a disgrace to human nature that a truth of that kind should require to be proved. 1 book, 12 chap. 128

All the laws quoted from the Spanish Code, which the counsel for the plaintiff is pleased to denominate *ecclesiastical laws*, have been long since abrogated and repealed. They had reference to an established state religion, which in Spain was exclusive. In this whole Union the separation of church and state is complete, and we trust eternal. How is it in Louisiana?

In the treaty of cession, the First Consul of the French Republic exacted a stipulation in favor of the *inhabitants* of the ceded territory, that they should be incorporated into the Union, and admitted as soon as possible according to the principles of the Federal Constitution, to the enjoyment of all the rights, advantages, and immunities of citizens of the United States, and that in the mean time they should be maintained· and protected in the free enjoyment of their *liberty, property*, and the *religion* which they profess. This stipulation was personal to every *inhabitant* of the country, in relation to his property, and the religion he might profess. He was solemnly guarantied the free enjoyment of his religious opinions, whatever they might be. It was not a stipulation in favor of any particular church, or religious establishment; but a full guaranty to every inhabitant of the ceded province, that he should not be molested on account of his religious belief, or form of worship. The States had already, in the Federal Constitution, forbidden Congress from passing any "law concerning an establishment of religion, or prohibiting the free exercise thereof;" and the people of Louisiana were promised a

full participation in the immunities and blessings, which such a provision was calculated to afford.

Among the first acts relating to the government of the ceded territory, Congress passed one, which was approved on the 2d of March, 1805, " further providing for the government of the territory of Orleans," which authorized the President of the United States to establish and organize within that territory, a government, in most cases similar to that existing in the Mississippi territory, and to appoint all officers, &c., " in conformity with the ordinance of Congress made on the 13th of July, 1787 ;" and the act declares that " from and after the establishment of said government, the inhabitants of the territory of Orleans shall be entitled to ei joy all the rights, privileges, and advantages, secured by said ordinance, and enjoyed by the people of the Mississippi territory."

That remarkable ordinance, which provided for the temporary government of the immense territory north-west of the Ohio, now embracing some of the most powerful and populous States in the Union, contained the following enunciations and provisions : " And for extending the fundamental principles of civil and religious liberty, which form the basis whereon these republics, their laws, and constitutions are erected ; to fix and establish these principles as the basis of all laws, constitutions, or governments, which forever hereafter shall be formed in said territory ; to provide also for the establishment of States, and permanent governments therein, and for their admission into the federal councils on an equal footing with the original States, at as early a period as may be consistent with the general interest ; it is hereby ordained and declared, &c., that the following articles shall be considered as *articles of compact* between the original States and the people and States in the said territory, and forever remain unalterable, unless by common consent, to wit: Article 1st. No person demeaning himself in a peaceable and orderly manner, shall ever be molested on account of his mode of worship, or religious sentiments in said territory." The people of Louisiana by the act of the then sovereign, became a party to this noble compact ; were made to participate in the enjoyment of this entire exemption from control, restraint, or liability in all

matters of religious belief or worship, and became solemnly bound
never to permit any enactment by legislative authority, tending to
molest any man on account of his mode of worship or his religious
sentiments. If the State constitution framed a few years afterwards,
contained no such restriction upon the legislative power, it was be-
cause it was thought unnecessary. It had already been settled
by solemn and inviolable compact, that religious freedom, in its
broadest sense, should form the essential "basis of all laws, con-
stitutions and governments," which forever after should be form-
ed in the territory, and that compact was declared to be unalter-
able, unless by common consent. The act of Congress of 1805
above cited, provided for carrying into effect the stipulations of
the treaty, as soon as the population should amount to sixty
thousand, by authorizing its admission into the Union, "provided
the constitution so to be established shall be republican, and not
inconsistent with the ordinance of the late Congress, passed on
the 13th July, 1787, so far as the same is made applicable to the
territorial government hereby authorized to be established."

It has, we believe, been the uniform opinion of the profession,
that these laws of Spain have ceased to exist, by their absolute
repugnance to the fundamental principles of our American gov-
ernments. The translators of the great body of the Spanish laws,
called *Las Siete Partidas* from which the counsel for the plain-
tiffs have quoted so largely, as still in force under the name of
ecclesiastical laws, omitted as not in force, the whole of the first
Partida, except the two first titles, which treat of laws, justice, cus-
toms, &c. They left out twenty-two titles embracing the whole
matter of a religious establishment, the Catholic faith, the sacra-
ments, the duties of the clergy, religious orders, vows, excom-
munication, simony, and sacrilege, advowsons, tithes, &c. &c.
In their preface they content themselves with saying, "those
parts which relate to the Catholic faith, and to matters of a crimi-
nal nature, *having been repealed,* are therefore *entirely omitted.*"
Nor is this a mere opinion of the translators, themselves learned
members of the bar. The work was published by authority, as
a translation of so much of the Partidas as had the force of law
in this State, by virtue of an act of the Legislature passed in
March, 1819, by which same act, Peter Derbigny, Stephen Maz-

ureau and Edward Livingston, were appointed to examine the manuscript, and to compare it with the original language, and to see that it was faithfully done, and contained all such laws of the Partidas, as were considered as having the force of laws in this State. It is true their certificate was afterwards dispensed with by an act of 1820 ; but it is nevertheless true, that the work was published and distributed by legislative authority, thereby clearly indicating the opinion of the Legislature, that such parts as are omitted in the translation are no longer in force. See acts of 1819, p. 44 ; and Acts of 1820, p. 20.

But if there could be the least possible doubt on this point, it has been removed by the act of 1828, which swept from the temple of the law every such relic of a barbarous age. That act provides, " that all the civil laws which were in force before the promulgation of the Civil Code lately promulgated, be and the same are hereby abrogated," &c. B. & C.'s Digest, 155.

But it is said, that these are not civil but *ecclesiastical* laws ; as if the Catholic faith and church were not themselves *civil* institutions in Spain ; as if the Partida, so often quoted, did not enact in so many words, *that the very beginning of the laws*, both spiritual and temporal, is faith in one God, in three persons, and in all the dogmas of the church, as matters of *civil* obligation ; as if that very law, which regards the right of presentation or advowson, as inherent in the *property of the church*, does not regulate a civil right—a matter of property ; as if the ecclesiastical laws of Spain, had survived every other part of its legislation, and we were now sitting as an *ecclesiastical* tribunal, to be guided in our decision by the Codes of the Alfonsos, the Phillips, and the Ferdinands. Such pretensions will not bear a moment's examination. While the laws of the 1st Partida are so confidently relied on by the plaintiffs' counsel, as still in force in all matters relating to the temporal administration of the Catholic Church, especially that which goes to show that the founder and owner had the right of presentation or patronage, it probably escaped his attention that the very next law of the same title, upsets his whole theory, by declaring, that only in the event of the patron being oppressed with poverty, shall the clergy allow him any part of the rents, or revenues, of the very church of which he was the

founder and patron, and then only in common with other *paupers*, though ; in rather a larger proportion thus giving to the *priest* nominated by the patron, the whole *management and control* of the *temporalities;* provided, however, that the founder might, by previous compact *with the bishop*, reserve to himself a certain portion of the rents.

What part of these laws shall we retain, and what part reject ? Shall we pick to pieces this tissue of enactments of the same age and color and general texture, relating to the same mixed system of civil and religious government in Spain, emanating from the same sovereign authority, and reject this *thread* because it is *civil* and retain *that* because it is ecclesiastical ?   No—the whole must be rejected together, as entirely obsolete, and abrogated by their utter repugnance to our fundamental laws.

It follows, we think incontestably, from what has been said, that the relation which exists between the bishop and the plaintiffs, according to their own allegations, implies no civil contract, and consequently given rise to no civil obligations.   It is not aleged, that any such contract exists.   On the contrary they allege, that his salary has been withdrawn and suppressed, because the wardens had overstepped their power in allowing it, and because the bishop never preached, as required to do by the canons and laws of the church.   We look, therefore, in vain, for any contract between the parties insisted on by one of the counsel for the plaintiffs in his printed brief, having for its object the gratification of some intellectual enjoyment, whether in religion, morality, or taste, or some convenience or other legal gratification spoken of in article 1928 of the Louisiana Code.   On the contrary, the bishop is quite independent of the church wardens, except in relation to his spiritual or sacerdotal functions.

But the same learned counsel contends, that the right to nominate a curate, or the *jus patronatus*, is a civil right, and he quoted 1 vol. Devoti, 242 ; and the senior counsel quoted to the same effect, the " Dictionary of the *Jesuit Trevoux.*"   That it was a civil right, while it existed, may be true; but there is no longer such a thing as a benefice, and consequently the right of advowson does not exist.   It was partly for the reason that it was a *civil* right, and any law creating it a *civil* law, that we came to the conclusion that it is abrogated.

The wardens administer the temporalities of the church, and may give or withhold salaries at their pleasure; and as they cannot compel the bishop to *institute* a curate of their appointment, so neither can he compel them to pay one whom he may have appointed or approved. No one pretends that the bishop has a right to interfere in the administration of the temporalities of the church, and to appropriate to himself, or his subordinates, any part of the revenues of the corporation. The curate according to the charter, has a deliberative vote in those matters, as one of the wardens. It is true, it is the duty of the wardens to apply the revenues, in part, to provide in a suitable manner for public worship. But they are responsible only to their constituents, for the manner in which they perform that trust; and although they are authorized to make any appropriate contract for that purpose, it does not follow that they can compel any one to contract with them, or that the bishop of New Orleans is in any legal sense, subordinate to the wardens of one of the churches within his diocese, in relation to his clerical functions.

We have thought the occasion justified our entering thus at large, into an examination of this subject, and stating explicitly our views of the extent and grounds of religious liberty according to the constitution and laws of Louisiana, of which the defendant, by his exceptions, claims the protection; and in declaring that, in the opinion of the court, no man can be molested, so long as he demeans himself in an orderly and peaceable manner, on account of his mode of worship, his religious opinions and profession, and the religious functions he may choose to perform, according to the rites, doctrine and discipline of the church or sect to which he may belong, and that this absolute immunity extends to all religions and to every sect. It is an ample shield, which it is the duty of the judicial power to hold with a firm hand, as well over the most exalted prelate of the church, as over the lowliest follower of him who was meek and lowly, and who emphatically declared that his *kingdom* is not of this world.

*Judgment affirmed.*\*

---

\* *Soulé, Canon,* and *Roselius,* prayed for a re-hearing, urging: 1. That the right of presentation is strictly a legal, or civil right, capable of being enforced in a court of justice, under the law in force at the time the church of St. Louis was built.

2. That the change of government, and repeal of the Spanish laws, could not impair the vested rights of the plaintiffs, and of those under whom they claim. See the decision of the Supreme Court of the United States in the case of *Dartmouth College* v. *Woodward,* 4 Wheat. 512 ; also *The Trustees of Montpellier Academy* v. *George et al ,* 14 La. 402. 3. That the rights claimed by the plaintiffs are not inconsistent with religious liberty, nor in any way incompatible with the institutions and laws of the State.

*Re-hearing refused.*